SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

Attorneys for Defendants
Barclays Bank plc and Long Island International Limited

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

Attorneys for Defendant
BlackRock Mortgage Investors Master Fund, L.P.

ORRICK, HERRINGTON & SUTCLIFFE, LLP
51 West 52nd Street
New York, New York  10019
(212) 506-5000

Attorneys for Defendant
Ballyrock ABS CDO 2007-1 Limited

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------------- x | | |
| In re | : | |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | Chapter 11 Case No. |
| | : | |
| Debtors. | : | 08-13555 (JMP) |
| ------------------------------------------------------------------- x | : | |
| | : | |
| LEHMAN BROTHERS SPECIAL FINANCING INC., et al. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | Adv. No. |
| | : | 09-01032 (JMP) |
| BALLYROCK ABS CDO 2007-1 LIMITED, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| ------------------------------------------------------------------- x | | |

**MOTION OF BARCLAYS BANK PLC, LONG ISLAND INTERNATIONAL LIMITED, BLACKROCK MORTGAGE  INVESTORS MASTER FUND, L.P., AND BALLYROCK ABS CDO 2007-1 LIMITED FOR LEAVE TO APPEAL ORDER DENYING <u>MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

PAGE

STATEMENT OF FACTS ............................................................................................ 2

THE PROCEEDINGS IN THE BANKRUPTCY COURT ....................................... 7

       A.     The Pleadings ............................................................................... 7

       B.     The Motion to Dismiss ................................................................. 8

       C.     The *Perpetual* Litigation ............................................................. 9

       D.     Other Flip Clause Proceedings in the Bankruptcy Court ........... 12

THE DECISION OF THE BANKRUPTCY COURT ............................................ 13

QUESTIONS TO BE PRESENTED ...................................................................... 15

THE REASONS WHY THE APPEAL SHOULD BE GRANTED ......................... 15

I.     THE STANDARD FOR LEAVE TO APPEAL ......................................... 17

II.    LBSF HAS CONCEDED THAT JUDGE PECK'S DECISION PRESENTS CONTROLLING QUESTIONS OF LAW ................................................... 19

III.   THE "UNPRECEDENTED" AND "CONTROVERSIAL" DECISION PRESENTS SUBSTANTIAL GROUNDS FOR DIFFERENCE OF OPINION ............... 20

       A.     The District Court Has Determined That There Are Substantial Grounds for Difference of Opinion Concerning Judge Peck's Application of the *Ipso Facto* Provisions. ........................... 20

       B.     There Are Substantial Grounds for Difference of Opinion as to Whether Section 560 Permits the Subordination of a Swap Termination Payment. ............................................................... 25

IV.   REVIEW OF THE DECISION WILL MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LITIGATION. .................................. 28

V.    THE DECISION PRESENTS "EXCEPTIONAL CIRCUMSTANCES" WARRANTING IMMEDIATE REVIEW BY THE DISTRICT COURT. ......... 30

CONCLUSION ..................................................................................................... 34

**TABLE OF AUTHORITIES**

Page(s)

CASES

*Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp.*
  *(In re Enron Creditors Recovery Corp.),*
  No. 09-9031, 2009 U.S. Dist. LEXIS 98611 (S.D.N.Y. Oct. 16, 2009) .................................20

*Boles v. Merck & Co. (In re Fosamax Prods. Liab. Litig.),*
  No. 06-1789 (JFK), 2011 U.S. Dist. LEXIS 72123 (S.D.N.Y. June 29, 2011) ................18, 28

*Enron Corp. v. Springfield Assocs., LLC (In re Enron Corp.),*
  M-47, 2006 U.S. Dist. LEXIS 63223 (S.D.N.Y. Sept. 5, 2006) ..................................17, 18, 19

*Escondido Mission Vill. L.P. v. Best Prods. Co.*, 137 B.R. 114 (S.D.N.Y. 1992) ........................18

*German v. Fed. Home Loan Mortg. Corp.*,
  No. 93 Civ. 6941 (NRB), 2000 U.S. Dist. LEXIS 10057 (S.D.N.Y. July 19, 2000) ..............32

*Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21 (2d Cir. 1990) .......................... 17, 19, 20, 32-33

*In re Cole*, 226 B.R. 647 (9th Cir. BAP 1998) .................................................................21

*In re IT Group, Inc., Co.*, 302 B.R. 483 (D. Del. 2003) .................................................21

*In re Worldcom*, No. M-47, 2003 U.S. Dist. LEXIS 11160 (S.D.N.Y. June 30, 2003) ...............19

*I.T.T. Small Bus. Fin. Corp. v. Frederique*, 82 B.R. 4 (E.D.N.Y. 1987) ......................................21

*Lehman Brothers Special Financing, Inc. v. BNY Corporate Trustee Services Limited*,
  422 B.R. 407 (Bankr. S.D.N.Y. 2010) ............................................................................ *passim*

*Lehman Bros. Special Fin. Inc. v. Bank of N.Y. Mellon Corp.*,
  No. 11-2784 (CM), 2011 U.S. Dist. LEXIS 67768 (S.D.N.Y. June 21, 2011) ......................20

*Lyons Savs. & Loan Ass'n v. Westside Bancorporation, Inc.*,
  828 F.2d 387 (7th Cir. 1987) .......................................................................................21

*McFarlin v. Conseco Servs.*, 381 F.3d 1251 (11th Cir. 2004) ......................................................28

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

### CASES
*(continued)*

*O'Leary v. Maxum Marine (In re Orange Boat Sales),*
   239 B.R. 471 (S.D.N.Y. 1999)..........................................................................18

*Triax Co. v. United States*, 20 Cl. Ct. 507 (1990)..........................................................32

### STATUTES AND RULES

11 U.S.C. § 101 ..............................................................................................25-26

11 U.S.C. § 362 ..........................................................................................10, 24, 26

11 U.S.C. § 365 ............................................................................................*passim*

11 U.S.C. § 507 ...................................................................................................24

11 U.S.C. § 541 ............................................................................................*passim*

11 U.S.C. § 546 ...................................................................................................29

11 U.S.C. § 547 ................................................................................................8, 29

11 U.S.C. § 548 ................................................................................................8, 29

11 U.S.C. § 549 ...........................................................................................8, 24, 29

28 U.S.C. § 158 ............................................................................................*passim*

28 U.S.C. § 1292 ..........................................................................................*passim*

Fed. R. Bankr. P. 8003 ..........................................................................................1

### OTHER AUTHORITIES

2 Collier on Bankruptcy ¶ 301.04 (16th ed. 2010) ....................................................24

136 CONG. REC. S7535 (daily ed. June 6, 1990) .......................................................27

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

**OTHER AUTHORITIES**
*(continued)*

1 David Epstein, Steve Nickles, & James White, *Bankruptcy* § 5-12 (1992) ..............................22

H.R. Rep. No. 101-484 (1990)..........................................................................................27

H.R. Rep. No. 109-31, pt. 1 (2005).....................................................................................28

Andrea A. Lunsford, *The St. Martin's Handbook* (6th ed. 2008)...........................................22-23

Gerald Lebovits, *Do's, Don'ts, and Maybes:  Legal Writing Grammar – Part II*,
N.Y. St. B.J. 80, Jan. 2008 ..............................................................................................23

*Webster's Third New International Dictionary* (2002) ...........................................................23

Pursuant to 28 U.S.C. § 158(a)(3) and Federal Rule of Bankruptcy Procedure 8003, defendants Barclays Bank plc, Long Island International Limited, and BlackRock Mortgage Investors Master Fund, L.P. (the "Noteholder Defendants") and defendant Ballyrock ABS CDO 2007-1 Limited ("Ballyrock," and collectively with the Noteholder Defendants, the "Moving Defendants") move for leave to appeal the Bankruptcy Court's Order dated June 28, 2011, insofar as it denied in part the motion of Ballyrock, joined by the Noteholder Defendants, to dismiss the Complaint.

As explained in its Memorandum Decision Granting in Part and Denying in Part the Motion to Dismiss by Defendant Ballyrock ABS CDO 2007-1 Limited, dated May 12, 2011 (the "Decision"),[1] the Bankruptcy Court denied the motion to dismiss with respect to two claims asserted by Lehman Brothers Special Financing Inc. ("LBSF"). The Bankruptcy Court held that certain provisions of the governing indenture, under which LBSF's right to a swap termination payment was subordinated to the rights of the noteholders, were unenforceable pursuant to the so-called *ipso facto* provisions of the Bankruptcy Code, 11 U.S.C. §§ 365(e)(l) and 541(c)(l)(B). The Decision is based on Judge Peck's prior decision in *Lehman Brothers Special Financing, Inc. v. BNY Corporate Trustee Services Limited*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) (the "*Perpetual* Decision"). In that case, the Bankruptcy Court recognized that its decision was "unique," "unprecedented," "break[ing] new ground," and "controversial." *Id.* at 422.

The District Court granted leave to appeal the *Perpetual* Decision. (Fritsch Decl.

---

[1]    A copy of the Decision is included as Exhibit 1 to the Declaration of Joshua Fritsch, subscribed to August 2, 2011, submitted in support of the Motion ("Fritsch Decl."). The Decision was memorialized in an Order dated June 28, 2011 (the "Order"). On the same day, the Bankruptcy Court entered a scheduling order providing that LBSF could file an Amended Complaint within 21 days after entry of the Order and extending the time for filing a notice of appeal and motion for permission to appeal from the Order until 14 days after the Amended Complaint was filed.

Ex. 2 [hereinafter "*Perpetual* Appeal Order"].)  It held that "it is readily apparent that the [*Perpetual* Decision] satisfies the requirements for granting an interlocutory appeal . . . as Judge Peck's decision involved a difficult question of first impression in this (and, apparently, any other) Circuit," and that in light of the turmoil the Bankruptcy Court's decision had caused in the financial markets, appellate review was needed "*now*" to determine whether the court's interpretation of the *ipso facto* provisions was correct.  (*Id.* 10, 12, 16 (emphasis in original).)  However, the *Perpetual* case was settled before the appeal could be decided.  The present motion seeks leave to appeal so that the District Court finally has the opportunity to consider the merits of an avowedly "unprecedented" interpretation of the Bankruptcy Code that has upended the expectations of the securities markets.

## STATEMENT OF FACTS

### 1.    The Ballyrock CDO Was Structured by LBSF

LBSF was a wholly-owned subsidiary of Lehman Brothers Inc. ("LBI"), a registered broker-dealer and subsidiary of Lehman Brothers Holdings Inc. ("LBHI").  "LBSF was Lehman Brothers Inc.'s principal dealer in a broad range of derivative products, including interest rate, currency, credit and mortgage derivatives."  (Report of the Lehman Brothers Holdings Inc. Chapter 11 Proceedings Examiner 1600, 1618 (Mar. 11, 2010), available at http://lehmanreport.jenner.com [hereinafter "Examiner's Report"].)  In July 2007, LBSF structured a synthetic collateralized debt obligation ("CDO") named Ballyrock ABS CDO 2007-1 Limited ("Ballyrock").  (*See* Fritsch Decl. Ex. 3 ¶ 14.)  As LBSF's counsel has confirmed, CDOs such as Ballyrock "were . . . largely structured by [LBSF] and its affiliates . . . ."  (Fritsch Decl. Ex. 4 at 22-23.)  Ballyrock raised money by selling notes (the "Notes"), of which the four most senior classes were rated AAA by Standard & Poor's and Aaa by Moody's, and purchased a portfolio of mortgage-backed and other asset-backed securities.  (Fritsch Decl.

Ex. 5.)

Ballyrock also entered into a credit default swap agreement ("CDS") with LBSF, under which LBSF purchased credit protection from Ballyrock on residential mortgage-backed securities or other fixed income assets (the "Reference Obligations").  (Fritsch Decl. Exs. 6-8.) LBSF agreed to make periodic premium payments to Ballyrock in exchange for Ballyrock providing LBSF with credit protection in case of certain defaults or other so-called "Credit Events" with respect to the Reference Obligations.  (Fritsch Decl. Ex. 3 ¶¶ 1, 14.)  LBHI guaranteed LBSF's obligations under the CDS as its "Credit Support Provider."  (*Id.*)

2.      **The ISDA Master Agreement, Which Provides the Terms of the Credit Default Swap, Defines "Events of Default" and "Termination Events"**

The terms of the CDS are set forth in an ISDA Master Agreement, which is a standard form used to document most swap agreements, together with a schedule to the Master Agreement and a confirmation.  (Fritsch Decl. Exs. 6-8.)  Section 6 of the ISDA Master Agreement provided that either party to the CDS could terminate the CDS by delivering a notice specifying an early termination date if the other party or its Credit Support Provider was the subject of any of seven defined "Events of Default" or, under certain circumstances, any of four defined "Termination Events."  The Events of Default are defined in section 5(a) of the Master Agreement.  Section 5(a)(vii) provides that it is an Event of Default if:

> The party [or] any Credit Support Provider of such party: . . . (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights . . . .

(Fritsch Decl. Ex. 6 at 6.)

**3.    The Ballyrock Indenture Details the Priority in Which
the CDO Shall Make Distributions to the Noteholders or LBSF**

Substantially all of Ballyrock's assets were held in trust pursuant to an indenture

(the "Indenture") among Ballyrock, as Issuer, Ballyrock ABS CDO 2007-1 Inc., as Co-Issuer,

and Wells Fargo Bank, N.A., as Trustee (the "Trustee").  The Indenture created a security

interest in the assets to secure Ballyrock's obligations pursuant to, *inter alia*, the Notes and CDS,

subject to the terms and conditions of the Indenture.  (*See, e.g.*, Fritsch Decl. Ex. 9 at 1-3;

§§ 3.2(b)(ix), 3.3(b)(vi), 7.5(a)(ii)-(iii).)  Because the Indenture provided security for the

transactions entered into under the CDS, the swap documentation identifies the Indenture as a

Credit Support Document and refers to and incorporates several of its principal terms.  (Fritsch

Decl. Ex. 7 at 26, 27-29.)

Critically, the Indenture contains detailed provisions, referred to as the "Priority

of Payments," specifying how income and principal proceeds of the trust assets are to be paid in

satisfaction of Ballyrock's obligations.  (Fritsch Decl. Ex. 9 at § 11.1.)  The Priority of Payments

states that, as a general matter, available proceeds of the trust assets shall be paid in satisfaction

of a swap termination payment, other than a Defaulted Synthetic Termination Payment, before

any remaining proceeds are paid to the noteholders.  (*Id.* at §§ 11.1(a)(iii)-(b)(i).)  The Priority of

Payments also states, however, that the obligations pursuant to the Notes shall be paid before any

of the proceeds are paid in satisfaction of a Defaulted Synthetic Termination Payment.  (*Id.*)  A

Defaulted Synthetic Termination Payment is defined as a termination payment payable by

Ballyrock pursuant to a swap "as a result of an 'Event of Default' or a 'Termination Event' as to

which [LBSF] is the 'Defaulting Party' or the sole 'Affected Party'."  (*Id.* at § 1.1, at 25.)  Upon

such a default, LBSF agreed that its right to any payment would be subordinated to the

noteholders.  (*Id.* at §§ 11.1(a)(iii) ("excluding any Defaulted Synthetic Termination Payment"

-4-

from amounts payable prior to the Notes), 11.1(a)(xix) (permitting a Defaulted Synthetic

Termination Payment following payment of 18 other categories of obligations, including the

Notes), 11.1(b)(xiii).)  These subordination portions of the Priority of Payments are collectively

referred to herein as the "flip clause."

      As LBSF's counsel has confirmed,[2] the Indenture governing the Notes and

termination payment were required to have this flip clause in order for the Notes to receive an

AAA rating from the various ratings agencies.[3]  LBSF was well aware of this when it structured

the Notes, and this feature is consistent across all securitizations that have material swap

exposures.  Had the language not been in the deal, the ratings agencies would not have rated the

Notes any higher than the rating of LBSF, the swap counterparty, as the deal would be exposed

to performance of the swap counterparty.  (*See*, *e.g.*, Fritsch Decl. Ex. 12 at 1, 5, 7 (noting that

failure to add structural features that would cause the transaction to terminate at no loss to the

---

[2]    Fritsch Decl. Ex. 4, at 22:16-18 (noting that "provisions" like the flip clause are included "at the behest of the rating agenc[ies]").

[3]    S*ee*, *e.g.*, Fritsch Decl. Ex. 10 (Dr. Stefan Bund, Alessandro Cipolla, Andre Dahlkamp, Euan Gatfield, Alex Kung, & Jennifer San Cartier, *Counterparty Risk in Structured Finance Transactions:  Hedge Criteria*, Fitch Ratings, Aug. 1, 2007, at 12 (a method "to provide additional protection to the noteholders in the event of a default by the counterparty is to make any termination payments owed by the SPV to the counterparty subordinate to any payments of interest and/or principal" in priority of payments)); Fritsch Decl. Ex. 11 (Edward Manchester, *Framework for De-Linking Hedge Counterparty Risks from Global Structured Finance Cashflow Transactions*, Moody's Investors Service, Oct. 18, 2010, *amending earlier article by* Bill Harrington, Nicholas Lindstrom, & Edward Manchester, May 25, 2006, at 8 & Table 2.B at A ("To ensure sufficient Counterparty risk de-linkage, [a termination payment to the swap counterparty] should only be made . . . once all amounts senior thereto in the respective priority of payments have been made, particularly when the Counterparty is the Defaulting Party . . . .")); *see also* Fritsch Decl. Ex. 12 (Michael Drexler & Katrien van Acoleyen, *CDO Spotlight:  Counterparty Risk In Structured Finance Transactions*, Standard & Poor's, Mar. 7, 2005, at 1 ("[M]itigated credit risk can be achieved . . . by structuring the transaction in such a way that it would terminate with no loss to investors if the counterparty did not comply with certain downgrade provisions.")).

noteholders "would necessitate the linking of the ratings on issued notes to . . . [the] rating of the counterparty" ).)  Without an AAA rating, many purchasers would have demanded materially higher coupons due to the higher perception of risk, as well as increased funding and capital charges, or, in the alternative, not purchased the securities at all.

      **4.**      **LBHI's Mid-September 2008 Bankruptcy, Not LBSF's Subsequent Bankruptcy in October, Triggered the Indenture's Flip Clause**

      LBHI commenced a chapter 11 bankruptcy case on September 15, 2008.  LBI, as a broker-dealer, was not entitled to commence a chapter 11 case, and LBHI made a deliberate decision to keep it out of bankruptcy so that it could continue to function as a going concern while LBHI sought to sell its business to Barclays Capital, Inc.  (Amended Disclosure Statement of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code, dkt. no. 18125, No. 08-13555, at 20 (Bankr. S.D.N.Y. June 29, 2011).)  On September 19, shortly before LBI was placed into a SIPA liquidation, LBHI caused LBI to transfer to LBHI its shares of LBSF and the other subsidiaries that Barclays did not want to acquire.  (Examiner's Report 2055-56.)  Nearly three weeks later, on October 3, 2008, LBSF filed its own chapter 11 petition.  Decision 13.

      On September 16, 2008, the day after LBHI commenced its chapter 11 case, at a time when LBSF was operating as a subsidiary of LBI while it was deliberately kept out of bankruptcy, and weeks before LBSF commenced its own bankruptcy case, Ballyrock notified LBSF that LBHI's filing constituted an Event of Default under the CDS and designated the same day as the "Early Termination Date."  Decision 7.

      Following the Early Termination Date, the first quarterly distribution date under the Indenture occurred on November 6, 2008.  On that date, the Trustee distributed approximately $189 million to noteholders in accordance with the Priority of Payments, leaving

approximately $137 million in assets remaining undistributed.  Decision 8.  The Trustee's report

that accompanied this distribution indicated that LBSF would have been entitled to an early

termination payment of approximately $404 million if the CDO had sufficient funds to satisfy

that payment.  However, because of the subordination of the Defaulted Synthetic Termination

Payment, the Trustee's report indicated that no termination payment would be made.  (Fritsch

Decl. Ex. 3 ¶ 8.)

**THE PROCEEDINGS IN THE BANKRUPTCY COURT**

**A.      The Pleadings**

On February 3, 2009, LBSF commenced this adversary proceeding against

Ballyrock and the Trustee.  The Complaint was evidently hastily drafted, and, in the subsequent

briefing of Ballyrock's motion to dismiss, LBSF sought to clarify and expand on its legal

theories.  As so elucidated, Count I of the Complaint sought a declaratory judgment that a

proposed distribution of the remaining $137 million to the noteholders would be "improper"

because the flip clause constituted an unenforceable penalty or forfeiture under New York law

and was invalid under the Bankruptcy Code's *ipso facto* provisions.  (Fritsch Decl. Ex. 3 ¶¶ 27,

30-32, 34, 38.)  Count II sought a declaratory judgment that the termination of the CDS was

improper because it violated the Indenture.  (*Id.* at ¶¶ 42-45, 47, 50.)  Count III sought an

injunction preventing Ballyrock and the Trustee from taking any action in furtherance of the

termination of the CDS or the distribution to noteholders based on the same grounds.  (*Id.* ¶¶ 51-

54.)

On February 5, 2009, the Trustee filed an Answer and Complaint in Interpleader

naming "Cede & Co., as Holder of certain Senior Notes, and John Does 1 through 100, as

owners of beneficial interests in the Senior Notes" as additional defendants.  (Fritsch Decl. Ex.

13.)  The Noteholder Defendants, as "owners of beneficial interests in the Senior Notes," entered

-7-

notices of appearance.  On June 3, 2009, with the consent of all the parties that had appeared, the

Bankruptcy Court entered an order granting the Trustee's request for interpleader, directing that

the remaining assets be held in the custody of the Court and requiring interested parties to assert

their claims to the assets, thereby mooting LBSF's claims for injunctive relief.  (Fritsch Decl. Ex.

14.)

        On July 19, 2011, two years after its initial Complaint and three weeks after the

Bankruptcy Court entered the Order that the Moving Defendants seek to appeal, LBSF filed an

Amended Complaint.  (Fritsch Decl. Ex. 15.)  The Amended Complaint does not add any

significant new factual allegations.  Instead, it asserts three state law counts seeking the recovery

of distributions already made to the Noteholder Defendants by the Ballyrock Trustee:  Unjust

Enrichment (Count VIII); Constructive Trust (Count IX); and Money Had and Received (Count

X).  (*Id.* ¶¶ 98-107.)  In addition, the Amended Complaint asserts "alternate" claims for

avoidance under sections 547, 548, and 549 of the Bankruptcy Code in the event that it is

determined that the *ipso facto* provisions *do not* invalidate the subordination of LBSF's

termination payment (Counts V, VI, VII).  (*Id.* ¶¶ 75-97.)

    **B.**    **The Motion to Dismiss**

        On March 31, 2009, Ballyrock filed a motion to dismiss the Complaint (Fritsch

Decl. Ex. 16).  After the Noteholder Defendants appeared, they were permitted to submit

additional papers in support of the motion.  (Fritsch Decl. Ex. 17.)  The Moving Defendants

argued, *inter alia*, that:

- The Bankruptcy Code's *ipso facto* provisions did not apply to the subordination of the swap termination payment because the swap was terminated, and the termination payment was subordinated, prior to LBSF's commencement of its chapter 11 case;

- The Bankruptcy Code's *ipso facto* provisions did not apply to the subordination of the swap termination payment because the swap was terminated, and the

termination payment was subordinated, based on LBHI's commencement of its bankruptcy case, while the *ipso facto* provisions only barred modifications of LBSF's contract or property rights based on LBSF's commencement of its own chapter 11 case;

- Alternatively, section 560 of the Bankruptcy Code creates an exception to the *ipso facto* provisions that preserved the subordination of the termination payment;

- The termination of the swap did not violate the Indenture; and

- The flip clause did not constitute a penalty so as to be unenforceable under New York law.

Briefing of the motion was completed, and oral argument was held on September 17, 2009.

     **C.**     **The *Perpetual* Litigation**

     The Decision on the Ballyrock motion is based on the Bankruptcy Court's holding in its own prior decision in *Perpetual* granting LBSF's motion for summary judgment, which was issued while the Ballyrock motion was pending.  In that case, LBSF had entered into CDS transactions with Saphir Finance Public Limited Company ("Saphir"), with BNY Corporate Trustee Services Limited ("BNY") acting as trustee.  LBHI acted as guarantor, and the CDS transactions were governed by an ISDA Master Agreement that defined Events of Default to include a bankruptcy filing by LBSF or LBHI.  *Perpetual Decision*, 422 B.R. at 413.  In contrast with the Indenture in the Ballyrock transaction, BNY held Saphir's assets pursuant to a trust deed governed by English law, but the trust deed contained provisions whose effect, as construed by the English courts, was to subordinate LBSF's right to receive a swap termination payment to Saphir's obligations to its noteholders, effective upon LBHI's commencement of its bankruptcy case.

     Despite acknowledging the "unique," "unprecedented" and "controversial" nature of its holding, the Bankruptcy Court held that "the provisions in the Transaction Documents purporting to modify LBSF's right to a priority distribution . . . constitute unenforceable *ipso*

*facto* clauses," and that "any attempt to enforce such provisions would violate the automatic stay" under section 362(a). *Id.* at 420-22. While disagreeing with the holding of the English courts that the subordination became effective when LBHI commenced its bankruptcy case, Judge Peck held that the *ipso facto* provisions would apply "even if LBHI's petition date were to be considered as the operative date for a claimed reversal of the payment priority under the Transaction Documents." *Id.* at 418-19.

To reach this result, the court interpreted the *ipso facto* provisions to bar a modification of the debtor's rights based on the commencement of "presumably *any* [bankruptcy] case that is related in some appropriate manner to the contracting parties." *Id.* at 419 (emphasis added). Judge Peck expressly avoided specifying any standard for determining what sort of relationship would cause the *ipso facto* provisions to apply based on some other debtor's bankruptcy case. Judge Peck conceded that his interpretation "has the potential of opening up a proverbial 'can of worms' that may lead to speculation as to the nature and degree of the relationship between debtors that is needed in order to properly apply the provision." *Id.* at 419.

The Bankruptcy Court then concluded that "the chapter 11 cases of LBHI and its affiliates is a singular event for purposes of interpreting this *ipso facto* language," and that LBHI's bankruptcy petition "commenced a case that entitled LBSF . . . to claim the protections of the *ipso facto* provisions of the Bankruptcy Code . . . ." *Id.* at 420. The court believed the chapter 11 cases of LBHI and its affiliates was a "singular event" because it was "convinced the 18-day delay in filing a bankruptcy petition for LBSF never would have occurred if . . . Debtors had enough time to devote to a coordinated process of bankruptcy planning." *Id.* at 420 n.8. However, Judge Peck took pains to make clear that he was not holding that LBSF's bankruptcy

case commenced with LBHI's petition.  He emphasized, "Nothing in this decision is intended to impact issues of substantive consolidation, the importance of each of the separate petition dates for purposes of allowing claims against each of the debtors or any other legal determination that may relate to the date of commencement of a case."  *Id*. at 420.

The Bankruptcy Court's decision in *Perpetual* directed LBSF to draft an order memorializing the court's ruling.  *Id*. at 422.  However, LBSF insisted that "it would be premature and potentially offensive to the English courts for Your Honor to enter any order at this juncture."  (Fritsch Decl. Ex. 18 at 1.)  At a court conference in February 2010, BNY asked for immediate entry of an order.  LBSF's counsel encouraged the Bankruptcy Court not to enter an order, and the Bankruptcy Court agreed to "defer" taking action.  (Fritsch Decl. Ex. 19 at 40:4-41:24.)  In March 2010, BNY again asked the Bankruptcy Court to enter an order.  LBSF opposed entry of an order and, again, the Bankruptcy Court stated that it would "defer taking any action."  (Fritsch Decl. Ex. 20 at 134:13-15.)  In April 2010, BNY renewed its request for an order, which LBSF once again opposed.  (*See* Fritsch Decl. Ex. 21 at 11:6-7.)  Eventually, BNY was forced to file a motion asking the Bankruptcy Court to enter an order memorializing the Decision.  (Fritsch Decl. Ex. 22.)  LBSF insisted that BNY's request for an order was so meritless it "should not be considered" by the Bankruptcy Court.  (Fritsch Decl. Ex. 21 at 11:5-6.)

At a June 30, 2010 hearing, Judge Peck "recognize[d] the importance of this litigation . . . to BNY, to LBSF and to . . . market participants who are looking at the risks of securitization transactions in light of the consequences of the ipso facto clause as I have interpreted those consequences."  (Fritsch Decl. Ex. 23 at 53:25-54:6.)  Despite acknowledging the critical importance of its ruling, Judge Peck made clear that he did not wish that ruling to be

subject to appellate review, lamenting the fact that an appeal will "neuter the effectiveness of the current ruling by creating a global doubt as to [its] correctness." (*Id*. at 51:7-8.) Ultimately, the Bankruptcy Court entered an interlocutory order memorializing the *Perpetual* decision on July 19, 2010. *Perpetual* Appeal Order 9.

On September 21, 2010, District Court Judge McMahon granted BNY's motion for leave to appeal from Judge Peck's decision in *Perpetual*. *Perpetual* Appeal Order 15-16. However, the case was settled before the District Court could decide the appeal. (Fritsch Decl. Ex. 24.)

### D.   Other Flip Clause Proceedings in the Bankruptcy Court

Subsequent to the commencement of the Ballyrock proceeding, LBSF or its affiliates have commenced a number of other proceedings alleging that the subordination of swap termination payments is barred by the *ipso facto* provisions.[4]  On September 14, 2010, LBSF filed two omnibus adversary proceedings—*Lehman Brothers Special Financing v. U.S. Bank*, No. 10-03542 (Bankr. S.D.N.Y.) (the "U.S. Bank Action") and *Lehman Brothers Special Financing v. Bank of America*, No. 10-03547 (Bankr. S.D.N.Y.) (the "Bank of America Action")—against a total of 215 named defendants.  Relying specifically on the *Perpetual* Decision, LBSF alleges, among other things, that the *ipso facto* provisions bar the subordination of termination payments owed to LBSF upon the filing of either LBHI's or LBSF's chapter 11 petitions.  (Fritsch Decl. Ex. 25  ¶¶ 30-37; Fritsch Decl. Ex. 26 ¶¶ 60-69.)  The Bank of America

---

[4]   *Lehman Bros. Fin. Prods. Inc. v. Bank of N.Y. Mellon Trust Co.*, No. 10-03544 (Bankr. S.D.N.Y.); *Lehman Bros. Special Fin., Inc. v. Bank of N.Y. Mellon Trust Corp*., No. 10-03545 (Bankr. S.D.N.Y.); *Lehman Bros. Special Fin., Inc. v. Ceago*, No. 10-04331 (Bankr. S.D.N.Y.); *Lehman Bros. Fin. Prods. Inc. v. Bank of N.Y. Mellon Trust Co.*, No. 10-03546 (Bankr. S.D.N.Y.); *Lehman Bros. Holdings Inc. v. Libra CDO Ltd.*, No. 09-01177 (Bankr. S.D.N.Y.); *Lehman Bros. Special Fin. Inc. v. Harrier Fin. Ltd.*, No. 09-01241 (Bankr. S.D.N.Y.).

Action also seeks to recover distributions already made by trustees to noteholders in reliance on the express terms of the governing documents.  (Fritsch Decl. Ex. 26 ¶ 7.)  Shortly after bringing these actions, LBSF requested that they be stayed, and the Bankruptcy Court granted LBSF's request.  (Fritsch Decl. Exs. 27, 28.)  Therefore, the defendants in those actions have not been able to challenge the merits of LBSF's claims.  At the same time, LBSF has used the *Perpetual* Decision as leverage in extracting settlements from counterparties[5] with the Bankruptcy Court's explicit approval.  At a hearing on April 13, 2011, in response to a statement that LBSF was using the *Perpetual* Decision as leverage in settlement negotiations, the Bankruptcy Court responded, "That's good for the estate.  Why is that a problem?"  (Fritsch Decl. Ex. 32 at 38:22-23.)

## THE DECISION OF THE BANKRUPTCY COURT

On May 12, 2011, nearly a year and ten months after the motion to dismiss the initial Complaint had been fully briefed and argued, the Bankruptcy Court denied the motion as to Counts I and III and granted it as to Count II.  Although LBSF's interest in the swap termination payment was subordinated based on LBHI's bankruptcy filing, nearly three weeks before the commencement of LBSF's chapter 11 case, the Bankruptcy Court ruled:

---

[5]     The terms of the Perpetual settlement reportedly favored Perpetual in the ratio of 80:20, indicating that even LBSF doubts the legal validity of the *Perpetual* decision.  (*See*, *e.g.*, Fritsch Decl. Ex. 29 (Henry Davis York, *HDY advises Perpetual in Lehman Bros Settlement* (May 18, 2011)); *see also* Fritsch Decl. Ex. 30 (Bryan Firth, *Investors look askance as Perpetual celebrates payout*, The Australian (May 19, 2011)).)  Nonetheless, based on a recent submission to the Bankruptcy Court, LBHI and LBSF (and other Lehman Brothers affiliates) have received approximately $800 million of settlements with derivatives counterparties.  Although LBHI and LBSF have not disclosed how many of these settlements were entered into in matters in which LBSF challenged the subordination of a termination payment pursuant to a flip clause, it is possible that LBSF has generated significant settlements as a result of the threat posed by the *Perpetual* and *Ballyrock* Decisions.  (Fritsch Decl. Ex. 31 at 1-2.)

> Consistent with the holding in *Perpetual*, [the *ipso facto*]
> provisions are broadly worded and protect a debtor from the
> operation of a clause triggered by not only its own bankruptcy
> filing but also by the bankruptcy of a related entity. This is so
> because each of these sections prohibits modification of a debtor's
> right solely because of a provision in an agreement conditioned
> upon "the commencement of a case under this title."

Decision 12-13.

Relying solely on its *Perpetual* Decision, Judge Peck held that LBSF's Complaint sufficiently stated claims "that the clause in question constitutes an unenforceable *ipso facto* provision that may not be enforced to deprive LBSF of rights on account of the chapter 11 filing of LBHI." Decision 13. The Bankruptcy Court also determined that the section 560 safe harbor did not protect the subordination of LBSF's swap termination payment because a subordination is not a "liquidation, termination or acceleration" of a swap agreement. Decision 13-14.

Notably, in reaching its conclusions concerning the application of the *ipso facto* provisions, the Bankruptcy Court relied on its conclusion in *Perpetual* that the Lehman Brothers chapter 11 cases were a "singular" event, reasoning that LBSF would have filed for chapter 11 simultaneously with LBHI if the "Debtors had enough time to devote to a coordinated process of bankruptcy planning." *Perpetual* Decision, 422 B.R. at 420 & n.8; Decision 13. However, the Report of the LBHI Examiner, which was released after the *Perpetual* Decision and before the *Ballyrock* Decision, contradicts the Bankruptcy Court's opinion. That report shows that "LBSF and LCPI continued to engage in a material amount of trading with LBI during the week of September 15" (Examiner's Report 2024) while LBI was deliberately kept out of bankruptcy following LBHI's bankruptcy filing. LBHI had obviously focused on LBSF no later than September 19, when it caused LBI to transfer its shares of LBSF to LBHI in the Lehman ALI Transaction described by the Examiner. (Examiner's Report 2055-56.) The fact that LBHI did not cause LBSF to commence a bankruptcy case until almost two more weeks had passed, on

-14-

October 3, makes clear that the delay of the filing was deliberate.

The Bankruptcy Court agreed with the defendants that Ballyrock's termination of the swap did not violate the Indenture and, therefore, dismissed Count II of the Complaint. Although Judge Peck stated that it was "not necessary for the Court to rule" on LBSF's claim that the subordination of the swap termination payment was unenforceable as a penalty or forfeiture under New York law, he recognized that "it is difficult to characterize the Defaulted Synthetic Termination Payment Clause as either a penalty or a forfeiture . . . [and] [i]t appears likely, as a result, that the clause would not be deemed to constitute an impermissible forfeiture provision in light of its clarity and the sophistication of the parties."  Decision 11 n.21.

## QUESTIONS TO BE PRESENTED

1.   Did the Bankruptcy Court err in determining that the Bankruptcy Code's *ipso facto* provisions prevented the modification of LBSF's rights more than two weeks before it commenced a bankruptcy case?

2.   Did the Bankruptcy Court err in holding that the *ipso facto* provisions, which bar modifications of the debtor's contract and property rights based on "the commencement of a case under this title," prohibited the subordination of LBSF's right to the swap termination payment based on LBHI's commencement of a bankruptcy case?

3.   Did the Bankruptcy Court err because its application of the *ipso facto* provisions to prevent Ballyrock's termination of its CDS from having the effect it would have outside of bankruptcy "limited" Ballyrock's "contractual right . . . to cause the liquidation, termination, or acceleration" of a swap agreement in violation of section 560 of the Bankruptcy Code?

## THE REASONS WHY THE APPEAL SHOULD BE GRANTED

Leave to appeal an interlocutory order of the Bankruptcy Court may be granted if there are "exceptional circumstances" justifying immediate review, including if (1) the "order involves a controlling question of law," (2) "there is substantial ground for difference of opinion" on the issue to be presented on appeal, and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  As the District Court has

already held in the *Perpetual* case, the Decision in this proceeding clearly satisfies these standards for immediate appeal.

The issues presented in this appeal, which include the proper scope and application of the Bankruptcy Code's *ipso facto* provisions and section 560's safe harbor for swaps, are "controlling question[s] of law" in this adversary proceeding.  Likewise, there can be no dispute that there are substantial grounds for difference of opinion in light of Judge Peck's own characterization of his holding in *Perpetual* as "controversial" and his observation that "[n]o case has ever declared that the operative bankruptcy filing is not limited to the commencement of a bankruptcy case by the debtor-counterparty."  422 B.R. at 422.

Noting that the *Perpetual* decision "presents precisely the sort of 'extraordinary circumstances' that warrant an interlocutory appeal," Judge McMahon held that the decision satisfied the test for interlocutory appeal "on its face."  *Perpetual* Appeal Order 15.  The Court concluded, "it is readily apparent that the [Bankruptcy Court's] Order satisfies the requirements for granting an interlocutory appeal . . . [as] Judge Peck's decision involved a difficult question of first impression in this (and, apparently, any other) Circuit," and the material impact that an appeal would have on the disposition of the *Perpetual* litigation "further demonstrates the need for immediate review."  *Id.* at 10, 12, 15.  The Court found that *Perpetual* presented:

> Precisely the sort of "extraordinary circumstances" that warrant an interlocutory appeal.  Judge Peck's decision is of obvious and critical importance to the LBHI bankruptcy, as it could allow LBSF to recover billions of dollars from various other structured finance deals that would otherwise be distributed to noteholders. Beyond the LBHI bankruptcy—which is itself a massive and extraordinary proceeding [the Bankruptcy Court's] interpretation of the Bankruptcy Code's *ipso facto* provisions has potentially far-reaching ramifications for the international securities markets, and has triggered significant uncertainty in the financial community . . . . LBSF essentially acknowledges that Judge Peck's decision upset market expectations, but counters that "it is

> perfectly appropriate for a court to upset those expectations if they
> are contrary to the law." (LBSF Mem. at 40.)   That may be the
> case . . . [b]ut the decision's potentially game-changing effect on
> the structured finance business does militate in favor of reviewing
> the decision now—not months, or even years, from now.

*Id*. 15-16.

I.    **THE STANDARD FOR LEAVE TO APPEAL**

Under 28 U.S.C. § 158(a)(3), the District Court has discretionary appellate jurisdiction over interlocutory orders of the Bankruptcy Court.  Although section 158(a)(3) does not provide a standard for granting leave to appeal, courts apply the standard for interlocutory review of District Court orders set forth in 28 U.S.C. § 1292(b).  *Perpetual* Appeal Order 10 (citing *Enron Corp. v. Springfield Assocs., LLC (In re Enron Corp.)*, M-47, 2006 U.S. Dist. LEXIS 63223, at *15-16 (S.D.N.Y. Sept. 5, 2006)).  Section 1292(b) provides that interlocutory review is appropriate if (1) the "order involves a controlling question of law," (2) "there is a substantial ground for difference of opinion" on the issue to be presented on appeal, and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).

A "question of law" is one that the reviewing court can decide "quickly and cleanly without having to study the record."  *See, e.g.*, *In re Enron Corp.*, 2006 U.S. Dist. LEXIS 63223, at *18.  A question is "controlling" for purposes of an interlocutory appeal if its determination "would terminate the action, or . . . would materially affect the litigation's outcome."  *Id.*  Substantial grounds for difference of opinion "must arise out of a genuine doubt as to whether the Bankruptcy Court applied the correct legal standard" and "may be met when there is conflicting authority on the issue or the issue is 'difficult and of first impression' in this Circuit."  *Perpetual* Appeal Order 11 (quoting *In re Enron Corp.*, 2006 U.S. Dist. LEXIS at *19; *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990)).  Appellate review will

-17-

materially advance the termination of this litigation if it "promises to advance the time for trial or

shorten the time required for trial" or "substantially reduce[s] the amount of litigation left in the

case." *Boles v. Merck & Co. (In re Fosamax Prods. Liab. Litig.)*, No. 06-1789 (JFK), 2011 U.S.

Dist. LEXIS 72123, at *12-13 (S.D.N.Y. June 29, 2011) (citations omitted).

Earlier decisions of the District Court held that leave to appeal from an

interlocutory decision of the Bankruptcy Court should be granted if immediate review was

justified by "exceptional circumstances," and treated satisfaction of the § 1292(b) standards as a

non-exclusive basis for finding "exceptional circumstances."  *See*, *e.g.*, *Escondido Mission Vill.*

*L.P. v. Best Prods. Co.*, 137 B.R. 114, 117 (S.D.N.Y. 1992) (granting leave to appeal based on

presence of "exceptional circumstances," even though movant failed to demonstrate presence of

controlling question of law); *O'Leary v. Maxum Marine (In re Orange Boat Sales)*, 239 B.R.

471, 474 (S.D.N.Y. 1999) ("[C]ourts have recognized the limitations of this analysis and have

found the standards of § 1292(b) inappropriate and have adopted a more flexible approach.").

More recent decisions contain language suggesting that "exceptional circumstances" is a

requirement *in addition to* the § 1292(b) standards.  *See Perpetual* Appeal Order 15-17; *In re*

*Enron Corp.*, 2006 U.S. Dist. LEXIS 63223, at *3.  The Moving Defendants submit that any

standard for interlocutory review of Bankruptcy Court decisions that is more restrictive than the

standard applicable to interlocutory decisions of the District Court is inconsistent with

Congress's intent as manifested in section 158(a)(3), authorizing the District Court to permit an

appeal from any order of the Bankruptcy Court, as well as 28 U.S.C. § 157(d), allowing the

District Court to withdraw any proceeding from the Bankruptcy Court "in whole or in part," "on

its own motion or on timely motion of any party, for cause shown."  However, it is clear that the

Decision in this proceeding merits interlocutory review under any standard.

-18-

## II.   LBSF HAS CONCEDED THAT JUDGE PECK'S DECISION PRESENTS CONTROLLING QUESTIONS OF LAW.

In *Perpetual*, LBSF conceded that the Bankruptcy Court's "novel" interpretations of the *ipso facto* provisions presented controlling questions of law.  *Perpetual* Appeal Order 11. The *Ballyrock* Decision is no different.  *First*, because the facts in this case are undisputed, the Bankruptcy Court's decision to apply the *ipso facto* provisions to a modification of LBSF's rights based on the commencement of LBHI's bankruptcy case, and prior to the commencement of LBSF's own bankruptcy case, presents "pure question[s] of law" that the Court "could decide quickly and cleanly without having to study the record."  *In re Enron Corp.*, 2006 U.S. Dist. LEXIS 63223, at *17 (quoting *In re Worldcom*, No. M-47, 2003 U.S. Dist. LEXIS 11160, at *10 (S.D.N.Y. June 30, 2003)).  In addition, a decision by the District Court to reverse (or affirm) the Bankruptcy Court's interpretation would certainly "materially affect the litigation's outcome." *Id.*; *see also Klinghoffer*, 921 F.2d at 24 (noting that the "resolution of an issue need not necessarily terminate an action in order to be 'controlling'").

*Second*, the application of the safe harbor for swap agreements created by section 560 of the Bankruptcy Code, which independently requires the enforcement of the flip clause, also presents a controlling question of law.  Section 560 provides that "the exercise of any contractual right of any swap participant . . . to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition specified in section 365(e)(1) of this title . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of" the Bankruptcy Code, such as the *ipso facto* provisions.  Judge Peck cited no precedent for his holding that the safe harbor did not protect the subordination.  Whether it does or not presents a pure question of statutory interpretation, and a reversal of Judge Peck's decision would have a material impact on the litigation because it would render irrelevant the interpretation and

application of the *ipso facto* provisions and any other provisions of the Bankruptcy Code that LBSF might invoke.

### III.   THE "UNPRECEDENTED" AND "CONTROVERSIAL" DECISION PRESENTS SUBSTANTIAL GROUNDS FOR DIFFERENCE OF OPINION.

#### A.   The District Court Has Determined That There Are Substantial Grounds for Difference of Opinion Concerning Judge Peck's Application of the *Ipso Facto* Provisions.

In *Perpetual*, the District Court concluded that "there [was] substantial ground for difference of opinion over whether Judge Peck applied the correct legal standard in reaching his decision that LBHI's bankruptcy filing entitled LBSF to claim the protections of the *ipso facto* provisions." *See Perpetual* Appeal Order 13.  The same result is required here.

Courts routinely note that "[w]hen a controlling question of law presents an issue of first impression, permission to appeal is often granted." *Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.)*, No. 09-9031, 2009 U.S. Dist. LEXIS 98611, at *35 (S.D.N.Y. Oct. 16, 2009).  Because the Decision involves "a difficult question of first impression in this (and, apparently, any other) Circuit . . . [this] *is enough to establish substantial ground for difference of opinion.*" *Perpetual* Appeal Order 12 (emphasis added) (citing *Klinghoffer*, 921 F.2d at 25); *see also Lehman Bros. Special Fin. Inc. v. Bank of N.Y. Mellon Corp.*, No. 11-2784 (CM), 2011 U.S. Dist. LEXIS 67768, at *11 (S.D.N.Y. June 21, 2011) (noting that, "sooner or later, Judge Peck's *one-of-a-kind* decision will be tested on appeal" (emphasis added)).

In addition, there is clearly "substantial ground for difference of opinion" here because the Bankruptcy Court's interpretation was inconsistent with the plain language of the statute.  First, both provisions, by their own terms, apply only to modifications of the debtor's rights at the time of or following the debtor's commencement of a bankruptcy case.  Section

-20-

365(e)(1) prohibits the application of certain contractual provisions to modify the debtor's contract rights "at any time after the commencement of the case."  Section 541(c)(2) only protects the debtor's interest in property covered by sections 541(a)(1), (2), and (5).  Those provisions only apply to property that is property of the debtor "as of the commencement of the case" or that the debtor acquired subsequent to the commencement of the case.  The purpose of these provisions is to protect the assets that are the subject of, and are being administered under court supervision as part of, a bankruptcy proceeding.  There simply is no statutory or other reasoned basis to apply these provisions to a company that has not yet become a debtor in a bankruptcy case.  Nor did the Bankruptcy Court provide any such reason in holding to the contrary with respect to LBSF.

Second, the text of the *ipso facto* provisions establishes that the commencement of the "case" in question that triggers the application of the *ipso facto* provisions is the debtor's *own* case, and not the case of some other party.  *See Perpetual* Appeal Order 12-13 (noting that numerous "legal and other commentaries" have questioned "the correctness of Judge Peck's ruling") (collecting articles).  "Prior cases in this and other circuits appear to assume . . . that the Bankruptcy Code's *ipso facto* provisions invalidate clauses that condition an event of default on the contracting party's *own* bankruptcy filing," not the bankruptcy filing of any other party.[6]

---

[6]     *See also Lyons Savs. & Loan Ass'n v. Westside Bancorporation, Inc.*, 828 F.2d 387, 393 n.6 (7th Cir. 1987) ("Section 365(e) . . .  invalidates *ipso facto* . . .  clauses which permit one contracting party to terminate or even modify an executory contract . . . in the event of the bankruptcy of the other contracting party."); *In re Cole*, 226 B.R. 647, 652 (9th Cir. BAP 1998) (same); *In re IT Group, Inc., Co.*, 302 B.R. 483, 488 (D. Del. 2003) (right of first refusal is not an *ipso facto* clause because "the right of first refusal is triggered by any transfer . . . and not by a member filing for bankruptcy"); *I.T.T. Small Bus. Fin. Corp. v. Frederique*, 82 B.R. 4, 6 (E.D.N.Y. 1987) ("An 'ipso facto' or 'bankruptcy clause' is a contractual provision which expressly states that *upon a borrower's filing of a bankruptcy petition*, the creditor may accelerate payment. . . .")

*Perpetual* Appeal Order 12.

For example, section 541(c)(1) states that property becomes property of the estate notwithstanding any contractual provision "that is conditioned on the insolvency or financial condition *of the debtor*, or the commencement of a case under this title . . . [or] that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property." (emphasis added).  As the Moving Defendants explained in the Bankruptcy Court, the natural reading of the sentence that includes "the commencement of a case" is that the term "of the debtor" in the first clause is equally applicable to the others, and that the draftspersons believed that repeating the language in the other clauses would be redundant.  (Fritsch Decl. Ex. 33 at 15.)

In addition, section 365(e)(1) governs "executory contracts . . . of the debtor" that existed when the debtor filed its bankruptcy petition.  Although section 365(e)(1)(B) states that the "the commencement of *a* case" cannot be used to terminate or modify a debtor's contractual rights, the statute's use of the indefinite article "a" in reference to "case" does not mean that Congress intended this provision to be triggered when *any* entity filed "a case."  Rather, because *no* case exists when the pre-bankruptcy debtor enters into the contract, the use of the indefinite article "a" is the grammatically proper way to refer to the debtor's case.  At the time a contract is executed, the indefinite article is required to refer to the debtor's case because such a case is only a hypothetical possibility. [7]  *See* Andrea A. Lunsford, *The St. Martin's Handbook* 802 (6th ed.

_____

(emphasis added); 1 David Epstein, Steve Nickles, & James White, *Bankruptcy* § 5-12 at 467-68 (1992) ("The term '*ipso facto*' was used to refer to those clauses that provided that the contract . . . terminated instantly . . . upon the filing of a bankruptcy petition by *one of the parties*." (emphasis added)).

[7]     Similarly, section 365(e)(1) states that "any right or obligation under such contract or lease may not be terminated or modified, at any time after *the* commencement of the case

2008) (noting the use of "a" with respect to an object indicates that the object "is hypothetical rather than actual"); *Webster's Third New International Dictionary* 1, 1147 (2002) (noting that in terms of indefinite articles, the dictionary defines "indefinite" as "typically designating an unidentified or not immediately identifiable person or thing"); *cf.* Gerald Lebovits, *Do's, Don'ts, and Maybes:  Legal Writing Grammar – Part II*, N.Y. ST. B.J. 80, Jan. 2008, at 80 ("'The' begins a noun phrase to refer to something already known to listeners or to assert the existence of something.").

Moreover, serious grounds for difference of opinion exist due to the Bankruptcy Court's inability to explain when a relationship between a parent and an indirect subsidiary is so intertwined that the bankruptcy filing by one entity triggers the application of the *ipso facto* provisions to the other.  Indeed, the Bankruptcy Court's conclusion that these filings—separated by nearly three weeks—somehow constitute a "singular event" is not based on *any* statute, rule or prior precedent.  Nor does the Decision state how many days must pass or otherwise articulate any circumstances in which such separate bankruptcy filings would *not* constitute a "singular event."

The Decision creates serious questions concerning the impact that a bankruptcy filing might have on inter-company obligations and guarantees, such as when a parent company issues a letter of credit to secure obligations of a subsidiary.  The Decision implies that a

---

. . . . " (emphasis added).  Section 365(e)(1)(A), which prohibits *ipso facto* clauses from modifying property interests of the debtor due to the debtor's "insolvency or financial condition of the debtor at any time before the closing of the case," uses the phrase "*the* case" because "the case" obviously must exist before it is "closed."  On the other hand, no such "case" (*i.e.*, "the case") exists when the pre-petition debtor enters into a contract that modifies contractual rights on the basis of the debtor's hypothetical, future case (*i.e.*, "a case").

subsidiary's guaranty of its parent's obligations is unenforceable if the guarantor's payment obligation is triggered by the parent's bankruptcy filing.

In addition, the court's interpretation implies that other provisions of the Bankruptcy Code might be applicable to a subsidiary after its indirect parent commences a bankruptcy case. Commencement of a bankruptcy case is a matter of the greatest possible legal and practical import for the debtor. For example, the filing of a petition makes the debtor subject to the automatic stay under 11 U.S.C. § 362(a), which renders void any of a large number of actions that the debtor's creditors and contract counterparties would take and rely on as effective in the ordinary course prior to the bankruptcy case. Under 11 U.S.C. § 549, any transfer of property subsequent to the commencement of the case is subject to avoidance unless authorized by the Bankruptcy Code or an order of the Bankruptcy Court. Conversely, an obligation incurred by a debtor in possession in the ordinary course of its business after the commencement of a chapter 11 case is entitled to an administrative priority, ahead of all prepetition unsecured claims. *See* 11 U.S.C. § 507(a)(2). Judge Peck expressly recognized the uncertainty concerning the application of provisions like these that is occasioned by his holding that LBSF become subject to the *ipso facto* provisions before it filed a bankruptcy petition, and expressly declined to deal with those uncertainties. *Perpetual* Decision, 422 B.R. at 419. Uncertainty concerning the applicability of such provisions may make it impossible for a subsidiary to continue its ordinary operations after an affiliate commences a bankruptcy case, thus denying a holding company that files for chapter 11 protection the opportunity to keep solvent subsidiaries out of bankruptcy.[8]

---

[8] Because of the gravity of commencing a bankruptcy case, a corporation's commencement of a case must normally be authorized by its board of directors. *See*, *e.g.*, 2 Collier on Bankruptcy ¶ 301.04[2][b] at 301-7 (16th ed. 2010) ("Typically, pursuant to state law . . . the authority [to commence a bankruptcy proceeding] rests with the corporation's

### B.   There Are Substantial Grounds for Difference of Opinion as to Whether Section 560 Permits the Subordination of a Swap Termination Payment.

There also is substantial ground for difference of opinion concerning whether the subordination of LBSF's termination payment was protected by the section 560 safe harbor for swap agreements.  Judge Peck held that the safe harbor does not apply because it only protects the "liquidation, termination, or acceleration" of a swap agreement, and not a subordination of a swap termination payment.  However, section 560 provides that "the exercise of any contractual right of any swap participant . . . to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition specified in section 365(e)(1) of this title . . . shall not be stayed, avoided, or otherwise *limited* by operation of any provision of" the Bankruptcy Code (emphasis added).  Preventing Ballyrock from closing out the CDS pursuant to its own terms, and denying its termination notice the effect it would have outside of bankruptcy, clearly *limits* the termination or liquidation of a swap.

The Priority of Payments was incorporated into the terms of the CDS.  Section 5(f) of the Schedule to the Master Agreement expressly provides that the liability of "Party B," *i.e.*, Ballyrock, under any swap is limited to the Collateral subject to the Indenture and that "any assets of Party B and proceeds thereof shall be applied in accordance with the Priority of Payments unless otherwise specified in the Indenture." (Fritsch Decl. Ex. 7 at 27.)[9]  Moreover, the Indenture is *itself* a swap agreement as defined in 11 U.S.C. § 101(53B) because it is a

---

board of directors.").  The petition LBSF filed on October 3 was accompanied by a resolution of its board authorizing the filing, dated the same day.  (Frisch Decl. Ex. 34.) Judge Peck's decision invades the power of corporate boards of directors to determine whether and when to invoke the protection of the Bankruptcy Code.

[9]   The Schedule to the Master Agreement incorporates the Indenture's definitions.  (Fritsch Decl. Ex. 7 at 1.)

"security agreement or arrangement or other credit enhancement relating to" a swap agreement.

Section 4(f) of the Schedule to the Master Agreement expressly identifies the Indenture as a

"Credit Support Document."  (*Id.* at 26.)  Thus, the Bankruptcy Court's Order and its

interpretation of the *ipso facto* provisions clearly limit Ballyrock's contractual rights to terminate

and liquidate the CDS in violation of section 560.

This construction of section 560 is supported by the language of a related

provision, 11 U.S.C. § 362(b)(17), which provides that the automatic stay under 11 U.S.C.

§ 362(a) will not apply to:

> the exercise by a swap participant or financial participant of any
> contractual right (as defined in section 560)[10] under any security
> agreement or arrangement or other credit enhancement forming a
> part of or related to any swap agreement, or of any contractual
> right (as defined in section 560) to offset or net out any termination
> value, payment amount, or other transfer obligation arising under
> or in connection with 1 or more such agreements, including any
> master agreement for such agreements.

Because the Indenture is a "security agreement" that forms "part of," and is "related to" a swap

agreement, this section expressly permitted Ballyrock to exercise its contractual rights under the

Indenture.

Moreover, the Decision flies in the face of the purpose of section 560.  When

Congress enacted section 560 in 1990, its purpose was clear:

> The effect of the swap provisions will be to provide certainty for
> swap transactions and thereby stabilize domestic markets by
> allowing the terms of the swap agreement to apply notwithstanding
> the bankruptcy filing.  Parties to the swap agreement can close out

---

[10]    Section 560 defines "contractual right" very broadly to include, *inter alia*, rights under
rules or bylaws of various clearing organizations, SROs, futures exchanges, the common
law, law merchant, or normal business practice.  It clearly includes the explicit
contractual rights set forth in the ISDA Master Agreement and the Indenture that was
incorporated by reference into the Schedule to the Master Agreement.

> all their transaction [sic] immediately and do not have to keep
> transactions open and unhedged during the bankruptcy
> proceedings.

136 CONG. REC. S7535 (daily ed. June 6, 1990) (statement of Sen. DeConcini); *see also* H.R.

Rep. No. 101-484 at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224 (noting that since

financial markets can "change significantly in a matter of days, or even hours, a non-bankrupt

party to ongoing securities and other financial transactions could face heavy losses unless *the*

*transactions are resololved [sic] promptly and with finality*" (emphasis added)).

Then, in 1998, the President's Working Group on Financial Markets published

recommendations to further the Congressional policies, which were explained in a statement by

the United States Department of the Treasury:

> The efficient operation of financial markets is extremely important
> to this country and our economy. It is the government's
> responsibility to make rules affecting these markets which serve to
> minimize systemic risk. Therefore, there is an overriding public
> policy interest in making limited exemptions to the normal
> treatment of creditors in bankruptcy proceedings in order to protect
> markets important to the operation of the economy as a whole.

(Fritsch Decl. Ex. 35 at 2.)

In 2005, Congress amended section 560 and other provisions of the Bankruptcy

Code relating to derivatives transactions, reaffirming its commitment to establishing safeguards

against bankruptcy-driven disruptions of the derivatives markets to enhance economic stability:

> These provisions are intended to reduce "systemic risk" in the
> banking system and financial marketplace. To minimize the risk
> of disruption when parties to these transactions become bankrupt
> or insolvent, the bill amends provisions of the banking and
> investment laws, as well as the Bankruptcy Code, to allow the
> expeditious termination or netting of certain types of financial
> transactions. Many of these provisions are derived from
> recommendations issued by the President's Working Group on
> Financial Markets and revisions espoused by the financial industry.

H.R. Rep. No. 109-31, pt. 1, at 20 (2005), *reprinted in* 2005 U.S.C.C.A.N. at 105-06 (footnotes omitted).

      Because the Decision denied enforcement under some undefined circumstances—but not under other circumstances—to the flip clause provisions drafted by LBSF and its affiliates, which they used to market billions of dollars in notes with AAA ratings, *see* Decision 12-13; *Perpetual* Decision, 422 B.R. at 423-25, it directly undermines Congress' intent that swap transactions be "resolved promptly and with finality" notwithstanding the bankruptcy of a counterparty.

### IV.  REVIEW OF THE DECISION WILL MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LITIGATION.

      Appellate review of the Decision now will "materially advance the ultimate termination of the litigation," as it will "substantially reduce the amount of litigation left in the case." *Boles*, 2011 U.S. Dist. LEXIS 72123, at *12-13 (quoting *McFarlin v. Conseco Servs.*, 381 F.3d 1251, 1259 (11th Cir. 2004)).  Here, as in *Perpetual*, because "Judge Peck's decision resolved controlling questions of law that may dispose of the ultimate issue in this Adversary Proceeding . . . immediate review of his ruling will materially advance the ultimate termination of the litigation." *Perpetual* Appeal Order 14.  There can be no serious dispute that, if the District Court reverses (or affirms) the Bankruptcy Court's interpretation of the *ipso facto* provisions and section 560, the major legal questions concerning LBSF's claims will be resolved, and this litigation and LBSF's other proceedings challenging the enforceability of flip clauses will be materially advanced.

      The Decision substantially resolved all the issues presented by LBSF's original Complaint and all LSBF's requests for relief against the parties named as defendants in that pleading.  In that Complaint, LBSF sought (1) a declaration that the flip clause was

unenforceable under the *ipso facto* provisions of the Bankruptcy Code and New York common law (Count I), (2) a declaration that the termination of the CDS violated the Indenture (Count II), and (3) injunctive relief preventing the disbursement of Ballyrock's remaining assets (Count III). The request for injunctive relief became moot when the Bankruptcy Court granted the Trustee's motion for interpleader and Ballyrock's assets were placed in the custody of the Court. The Decision in effect grants the requested declaration that the flip clause is invalid, based on the Bankruptcy Code's *ipso facto* provisions, and denies the request for a declaration that the termination of the CDS violated the Indenture.

LBSF's belated amendment to its Complaint to add new claims against different parties does not make the Decision any less important to the ultimate resolution of this action. In the Amended Complaint, LBSF added three counts seeking relief against the Noteholder Defendants (*i.e.*, Unjust Enrichment, Money Had and Received, and Constructive Trust) that are *only* relevant if the subordination of LBSF's termination payment is found unenforceable. (Fritsch Decl. Ex. 15 ¶¶ 98-107.) LBSF also added three avoidance claims under sections 547, 548 and 549 of the Bankruptcy Code that—in addition to being without merit[11]—are "alternate" causes of action that are only relevant if the Bankruptcy Court finds that the flip clause is actually enforceable. (*Id.* ¶¶ 75-97.) Because the Bankruptcy Court has held that the Ballyrock

---

[11] For example, the claims under section 547 and 548 are untimely as they have been filed nearly a year after the applicable statute of limitations expired. *See* 11 U.S.C. § 546(a). These avoidance claims are also precluded by section 546(g), which prohibits the avoidance of any "transfer, made by or to (or for the benefit of) a swap participant . . . under or in connection with a swap agreement." With respect to LBSF's claim that the subordination of its termination payment is voidable as a post-petition transfer under 11 U.S.C. § 549, which provides for avoidance of post-petition transfers that are not authorized by the Bankruptcy Code or any order of the Bankruptcy Court, this claim is plainly without merit because its termination payment was subordinated weeks before LBSF commenced its bankruptcy case, at a time when the Bankruptcy Code did not apply to it.

flip clause is *not enforceable*, these new claims will have no function to perform, and will not be the occasion for any further litigation in the Bankruptcy Court, unless and until the District Court reviews and reverses Judge Peck's Decision.

### V.   THE DECISION PRESENTS "EXCEPTIONAL CIRCUMSTANCES" WARRANTING IMMEDIATE REVIEW BY THE DISTRICT COURT.

Because "exceptional circumstances" clearly exist here, immediate appellate review is warranted.  *See Perpetual* Appeal Order 10.  The Bankruptcy Court's frank acknowledgement that its interpretation of the *ipso facto* provisions would upset the expectations of those who had invested in the structured finance market by invalidating the agreed-upon Priority of Payment provisions demonstrates that "exceptional circumstances" exist which justify immediate appeal of its decisions:

> The Court recognizes that there is an element of commercial expectation that underlies the subordination argument.  LBSF was instrumental in the development and marketing of the complex financial structures that are now being reviewed from a bankruptcy perspective.  The Court assumes that a bankruptcy affecting any of the Lehman entities was viewed as a highly remote contingency at the time that the Transaction Documents were being prepared.  At that time, LBSF agreed to a subordination of its Swap Counterparty Priority in the hard-to-imagine event that it should be in default at some time in the future.  Capital was committed with this concept embedded in the transaction.

*Perpetual* Decision, 422 B.R. at 422 n.9.

This "commercial expectation" that termination payments to LBSF would be subordinated when LBSF defaulted was a key element in investors' decisions to invest in the highly illiquid notes issued by CDOs such as Ballyrock.  For example, credit rating agencies specifically described priority of payment provisions, like those at issue here, as an important element that they considered in rating CDOs.  (*See supra* notes 2-3.)  The importance of subordinating these swap termination payments is apparent from the economics and structure of

synthetic transactions such as Ballyrock.  Generally, a CDS remains in existence until the notes

issued by the structure are paid off.  Although protection payments may have been payable to

LBSF each quarter depending on the performance of the Reference Obligations, the current total

value of the CDS is only payable upon the termination of the CDS.[12]  If a CDS is terminated

early after the CDS counterparty goes into bankruptcy, then the termination payment amount

would be valued as of the Early Termination Date.  If the swap happened to be "in the money" to

LBSF on that date, then the vehicle (*i.e.*, Ballyrock) would be saddled with the choice between

(i) leaving in place a swap with a bankrupt counterparty that had already defaulted under its

obligations and presumably would be unable to make premium payments and (ii) terminating the

swap and paying significant termination payments to a counterparty that only became "entitled"

to a termination payment *due to its own default*.  The solution that the parties to these

transactions agreed upon—and that the ratings agencies and investors relied on—was that if

LBSF defaulted, it would be paid after the noteholders.  As numerous articles have noted, the

Bankruptcy Court's decisions have unilaterally and spectacularly unsettled these market

expectations.[13]

---

[12]     *See, e.g.*, Fritsch Decl. Ex. 36 (Izabella Kaminska, *Europe's ABS Currency – Swap
Exposure*, Fin. Times (Feb. 15, 2010) (blog) ("Even though the swaps undergo mark-to-
market gains and losses over the life of an ABS transaction, the fact that the Notes are
supposed to be hedged over the life of the transaction means gains and losses have no
discernible 'real-world consequence' for noteholders.")).

[13]     *See, e.g.*, Fritsch Decl. Ex. 37 (Elana Hahn, *Flip Flop on Flip Clauses Continues*, Total
Securitization & Credit Inv., Feb. 25, 2011 ("According to Fitch Ratings[], the impact of
Judge Peck's decision on existing structured finance ratings could be wide ranging
globally and European structured finance transactions may be most impacted given the
prevalence of derivatives to hedge interest rate and foreign exchange risk . . . .  A
significant segment of market participants had expected Judge Peck's decision to be
overturned on appeal . . . ." (footnote and quotation marks omitted))); Fritsch Decl. Ex.
38 (Sarah White, *Lehman Battles Investors Over Derivative Payouts*, Reuters, Mar. 4,
2011 (noting that the Bankruptcy Court's decision in *Perpetual* "sparked alarm among

-31-

Leave for appeal also should be granted for the separate reason that establishing the correct standards for applying the *ipso facto* provisions and section 560 will have a material effect on the outcome of the other proceedings in the Bankruptcy Court, involving hundreds of defendants, in which LBSF challenges the enforceability of flip clauses in other transactions.  In determining whether to grant interlocutory appeal under section 1292(b), a court may consider the impact that allowing appeal might have on "actions pending in state and federal courts . . . that assert [related] causes of action."  *German v. Fed. Home Loan Mortg. Corp.*, No. 93 Civ. 6941 (NRB), 2000 U.S. Dist. LEXIS 10057, at *5 (S.D.N.Y. July 19, 2000).  Leave to appeal may be granted if the appeal "would significantly affect a large number of cases as well as the conduct of the present action."  *Id.*; *see also Triax Co. v. United States,* 20 Cl. Ct. 507, 514 (1990) (allowing appeal as "an appellate ruling on the question presented by this order could potentially contribute to the termination of a large number of cases at an early stage").  Similarly, in deciding whether to accept an appeal that had been certified, the Second Circuit has noted that a court may "properly consider the system-wide costs and benefits of allowing the appeal.  In other words, the impact that an appeal will have on other cases is a factor that we may take into

---

lawyers, noteholders, and academics watching the securitization industry")); Fritsch Decl. Ex. 39 (Christopher Elias, *U.S. Banks Forced Out of U.K.:  Securitisation Rebounds, Harmonisation Confounds*, Westlaw Bus., June 28, 2010 ("Causing international problems is an esoteric but profound decision in the U.S. Bankruptcy Court . . . over the bankruptcy priority of noteholders and credit swap counterparties that may have the power to squeeze out U.S. banks from the European securitisation industry.")); Fritsch Decl. Ex. 40 (Thai News Service, *Fitch Amends Counterparty Criteria for Derivative Issues Following Lehman Court Settlement*, March 15, 2011); Fritsch Decl. Ex. 41 (Aline van Duyn & Nicole Bullock, *Lehman Ruling Creates New Doubts for CDOs*, Fin. Times, Feb. 9, 2010); Fritsch Decl. Ex. 42 (Seth Grosshandler, et al., *The Importance of LBSF v. BNY Corp.*, Law360.com, Feb. 23, 2010); Fritsch Decl. Ex. 43 (Andrew Cavenagh, *Dante's Inferno*, FTSE Global Markets, June 2010); Fritsch Decl. Ex. 44 (*U.S. Court Ruling Threatens Securitisation*, Int'l Fin. R., Jan. 2010); Fritsch Decl. Ex. 45 (Christopher Whittall, *Lehman SPV Trustee Trapped by Contrasting Rulings*, Risk.net, Feb. 2, 2010).

account in deciding whether to accept an appeal that has been properly certified by the district court." *Klinghoffer*, 921 F.2d at 24.

Of course, the District Court has already recognized the importance of these market expectations, and the significant uncertainty that the Bankruptcy Court's interpretation has injected into the securities and structured finance markets.  As the *Perpetual* Appeal Order noted, *Perpetual* (like the *Ballyrock* proceeding) presented "precisely the sort of 'extraordinary circumstances' that warrants an interlocutory appeal "as it could allow LBSF to recover billions of dollars from various other structured finance deals that would otherwise be distributed to noteholders."  *Perpetual* Appeal Order 15.  Because the Decision has significant "ramifications for the international securities markets, and has triggered significant uncertainty in the financial community . . . the decision's potentially game-changing effect on the structured finance business *does* militate in favor of reviewing the decision *now*—not months, or even years, from now."  *Id*. 16.  It is now more than 18 months since Judge Peck issued his decision in *Perpetual*. The District Court should now grant leave to appeal the Decision so that the "turmoil" caused by the *Ballyrock* and *Perpetual* Decisions can finally be resolved.

## CONCLUSION

For the foregoing reasons, the District Court should grant the Moving Defendants leave to appeal the Decision pursuant to 11 U.S.C. § 158(a)(3).

Dated:  New York, New York
        August 2, 2011

/s/ Robinson B. Lacy
Robinson B. Lacy
Joshua Fritsch
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000

*Attorneys for Defendants*
*Barclays Bank plc and Long Island International*
*Limited*


/s/ Nicholas P. Crowell

Andrew W. Stern
Nicholas P. Crowell
Alex J. Kaplan
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
Telephone:  (212) 839-5300

*Attorneys for Defendant*
*BlackRock Mortgage Investors Master Fund, L.P.*


/s/ Steven J. Fink

Steven J. Fink
ORRICK, HERRINGTON & SUTCLIFFE, LLP
51 West 52nd Street
New York, NY  10019
(212) 506-5000
*Attorneys for Defendant*
*Ballyrock ABS CDO 2007-1 Limited*

-34-

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

Attorneys for Defendants
Barclays Bank plc and Long Island International Limited

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

Attorneys for Defendant
BlackRock Mortgage Investors Master Fund, L.P.

ORRICK, HERRINGTON & SUTCLIFFE, LLP
51 West 52nd Street
New York, New York  10019
(212) 506-5000

Attorneys for Defendant
Ballyrock ABS CDO 2007-1 Limited

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

In re                                                                  :
                                                                       :
LEHMAN BROTHERS HOLDINGS INC., et al.,                                 :     Chapter 11 Case No.
                                                                       :     08-13555 (JMP)
                    Debtors.                                           :
-----------------------------------------------------------------------x
LEHMAN BROTHERS SPECIAL FINANCING INC., et al.                         :
                                                                       :
                    Plaintiff,                                        :
                                                                       :
                    -against-                                          :     Adv. No.
                                                                       :     09-01032 (JMP)
BALLYROCK ABS CDO 2007-1 LIMITED, et al.,                              :
                                                                       :
                    Defendants.                                        :
-----------------------------------------------------------------------x

**<u>NOTICE OF APPEAL</u>**

Defendants Barclays Bank plc, Long Island International Limited, BlackRock Mortgage Investors Master Fund, L.P. and Ballyrock ABS CDO 2007-1 Limited ("Ballyrock"), by their undersigned counsel, appeal under 28 U.S.C. § 158(a) from the Order Granting in Part and Denying in Part the Motion to Dismiss of Ballyrock, entered in this adversary proceeding on June 28, 2011, which is attached to this Notice of Appeal.

The names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their respective attorneys are as follows:

**APPELLANTS:**

*Barclays Bank plc and Long Island International Limited*

Robinson B. Lacy
Joshua Fritsch
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
212-558-4000

*BlackRock Mortgage Investors Master Fund, L.P.*

Andrew W. Stern
Nicholas P. Crowell
Alex J. Kaplan
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
212-839-5300

**PLAINTIFF-APPELLEE:**

*Lehman Brothers Special Financing, Inc.*

Ralph I. Miller
Richard W. Slack
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10163
212-310-8000

**INTERVENOR-APPELLEE:**

*Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al.*

Eric D. Winston
Erica Taggart
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
213-443-3000

Susheel Kirpalani
James Tecce
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue
New York, NY 10010
212-849-7000

**APPELLANTS** *(continued)*:

*Ballyrock ABS CDO 2007-1 Limited*

Steven J. Fink
ORRICK, HERRINGTON & SUTCLIFFE, LLP
51 West 52nd Street
New York, NY  10019
212-506-5000

Dated:   New York, New York
         August 2, 2011

                                        /s/ Robinson B. Lacy
                                        Robinson B. Lacy
                                        Joshua Fritsch
                                        SULLIVAN & CROMWELL LLP
                                        125 Broad Street
                                        New York, New York 10004-2498
                                        Telephone:  (212) 558-4000

                                        *Attorneys for Defendants Barclays Bank plc*
                                        *and Long Island International Limited*

                                        /s/ Nicholas P. Crowell
                                        Andrew W. Stern
                                        Nicholas P. Crowell
                                        Alex J. Kaplan
                                        SIDLEY AUSTIN LLP
                                        787 Seventh Avenue
                                        New York, New York 10019
                                        Telephone:  (212) 839-5300

                                        *Attorneys for Defendant BlackRock*
                                        *Mortgage Investors Master Fund, L.P.*

                                        /s/ Steven J. Fink
                                        Steven J. Fink
                                        ORRICK, HERRINGTON & SUTCLIFFE, LLP
                                        51 West 52nd Street
                                        New York, New York  10019
                                        (212) 506-5000

                                        *Attorneys for Defendant*
                                        *Ballyrock ABS CDO 2007-1 Limited*

# ATTACHMENT

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- :
                          :      Chapter 11

In re                      :

                      :      Case No. 08-13555 (JMP)

LEHMAN BROTHERS HOLDINGS INC., et al.,  :

                      :      (Jointly Administered)

             Debtors.        :

                      :

---------------------------------------------------------------- :

                      :

LEHMAN BROTHERS SPECIAL FINANCING INC., :

                      :      Adversary Proceeding

                      :

            Plaintiff,       :      No. 09-01032 (JMP)

-against-                   :

                      :

BALLYROCK ABS CDO 2007-1 LIMITED, and    :
WELLS FARGO BANK, N.A., TRUSTEE       :

                      :

            Defendants.      :

---------------------------------------------------------------- :

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO**
**DISMISS OF DEFENDANT BALLYROCK ABS CDO 2007-1 LIMITED**

      Upon consideration of the motion to dismiss, as well as the memorandum of law and

declaration and exhibits in support thereof, of Defendant Ballyrock ABS CDO 2007-1 Limited

("<u>Ballyrock</u>") dated March 31, 2009 (the "<u>Motion</u>"),[1] the memorandum of law and supporting

declaration and exhibits of Counterclaim-Defendants Barclays Bank PLC, Long Island

International Limited, BlackRock Mortgage Investors Master Fund, L.P., and Long Hill 2006-1,

Ltd. (collectively, the "<u>Noteholders</u>") in further support of the Motion, the opposition of Plaintiff

Lehman Brothers Special Financing Inc. ("<u>LBSF</u>") dated July 21, 2009, the joinder in LBSF's

opposition dated July 21, 2009 and filed by Intervenor, the Official Committee of Unsecured

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

Creditors, and the reply memorandum of law of Ballyrock and the Noteholders dated August 7, 2009; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the amended order entered February 13, 2009 governing case management and administrative procedures (Docket No. 2837); and after due deliberation and sufficient cause appearing therefor, for the reasons set forth in the Court's Memorandum Decision, dated May 12, 2011, granting in part and denying in part the Motion, it is hereby

ORDERED that the Motion is DENIED with respect to counts I and III of the Complaint; and it is further

ORDERED that the Motion is GRANTED with respect to count II of the Complaint.


Dated: New York, New York
       June 28, 2011

                                    _s/ James M. Peck_____
                                    Honorable James M. Peck
                                    United States Bankruptcy Judge